NOTICE:  This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports.  Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2021 VT 67

No. 2021-024

| | |
|---|---|
| In re Petition of Portland Street Solar LLC | Supreme Court |
| | On Appeal from<br>Public Utility Commission |
| | May Term, 2021 |

Anthony Z. Roisman, Chair

Kimberly K. Hayden of Paul Frank + Collins P.C., Burlington, for Appellant.

Eric B. Guzman, Special Counsel, Montpelier, for Appellee Vermont Department of Public Service.

PRESENT:  Reiber, C.J., Robinson, Eaton, Carroll and Cohen, JJ.

¶ 1.  **ROBINSON, J.**  Portland Street Solar LLC appeals an order of the Public Utility Commission denying Portland Street's petition for a certificate of public good (CPG) under 30 V.S.A. §§ 248 and 8010 to install and operate a 500-kW solar group net-metering system adjacent to a previously permitted solar array owned by Golden Solar, LLC.[1]  Interpreting the definition of "plant" set forth in 30 V.S.A. § 8002(18), the Commission determined that the proposed Portland Street project would be part of a single plant along with the already-approved adjacent Golden

---

[1]  Apart from an exception not relevant here, Vermont law prohibits companies from constructing new electric-generating facilities without first obtaining a CPG from the Commission. See 30 V.S.A. § 248(a)(2).  The Commission determines whether to issue a CPG based on extensive criteria set forth in § 248.  The Legislature has provided a simplified procedure for approving small net-metering systems, including solar arrays.  Since January 1, 2017, the simplified procedure has been codified in § 8010.  See 2013, No. 99 (Adj. Sess.), § 10(d).

Solar project and thus would exceed the 500-kw energy-generating-capacity limit applicable in the net-metering program. On appeal, Portland Street argues that the Commission's decision is inconsistent with this Court's controlling precedent, as well as prior Commission decisions involving similar cases, and that the Commission exceeded its statutory authority by expansively construing the component parts of § 8002(18) that define the characteristics of a single plant.

¶ 2. The central question before us is whether the Commission committed reversible error in concluding, based on its interpretation of the definition of "plant" set forth in § 8002(18), that the Portland Street facility is, along with the previously approved Golden Solar facility at the same location, part of a single plant and thus ineligible to benefit from a net-metering program limited to facilities with a 500kW maximum energy-generating capacity. Applying the appropriate deferential standard of review, we conclude that the Commission's self-described expanded and refined interpretation of what constitutes a single plant under § 8002(18) is not arbitrary, unreasonable, or discriminatory and does not amount to compelling error that would require this Court to intervene in matters the Legislature has delegated to the Commission's expertise. Accordingly, we affirm the Commission's decision denying Portland Street's petition for a CPG to install and operate its proposed facility under the net-metering program.

I. Facts and Procedural History

¶ 3. The following facts are drawn from the Commission's decision, which adopted the hearing officer's findings of fact. The Golden Solar and proposed Portland Street solar projects are situated on an 82.2-acre parcel of land along Portland Street in St. Johnsbury. The two facilities are owned by separate limited liability companies (LLCs). Norwich Technologies, Inc., also known as Norwich Solar, owns both LLCs, as well as the property on which the projects are sited. At different times, principals of the Golden Solar and Portland Street projects petitioned for CPGs under distinct programs aimed at promoting the development of renewable energy by benefitting small-to-moderately-sized renewable energy facilities.

2

¶ 4.    Golden Solar is a solar-powered electric system with a standard-offer contract to deliver up to 2.2 MW of electricity.[2]  In December 2017, Green Mountain Power (GMP) issued a Feasibility Study to Sunny Acres, the original holder of the standard-offer contract, for the Golden Solar facility.  GMP required Sunny Acres to upgrade the existing distribution line along Portland Street with 4500 feet of new conductor to connect to the Golden Solar facility.  In December 2018, Golden Solar filed a petition for a CPG to install and operate its facility, which would occupy 25.82 acres of the 82.2-acre parcel.  In August 2019, the Commission granted a CPG to Golden Solar for its proposed facility, and in September 2019, the Commission extended to December 2020 Golden Solar's standard-offer contract deadline for commissioning the facility.

¶ 5.    On June 27, 2019, seven weeks before the Commission approved a CPG for the Golden Solar facility, Portland Street filed its petition to install and operate a 500-kW group net-metering solar system on approximately seven acres of the same 82.2-acre St. Johnsbury parcel on which Golden Solar was to operate.[3]

---

[2]  The standard-offer program is part of a larger program encouraging the development of renewable energy in Vermont by requiring electric utilities to purchase a certain amount of power from limited-sized (up to 2.2 MW) electrical providers under long-term power-purchase contracts that guarantee a set price for the providers' energy for the duration of the contract.  See In re Chelsea Solar LLC, 2021 VT 27, ¶ 3, ___ Vt. ___, ___ A.3d ___; see also 30 V.S.A. § 8005a(b)-(c) (establishing 2.2-MW maximum energy-generating capacity for individual standard-offer plants and 127.5 MW cumulative plant capacity under program).

[3]  The Commission is required by law to "adopt and implement rules that govern the installation and operation of net metering systems."  30 V.S.A. § 8010(c).  Among other things, the rules "shall establish and maintain a net metering program" that advances specified goals and renewable targets, id. § 8010(c)(1)(A), and "shall establish standards and procedures governing application for and issuance or revocation of a certificate of public good for net metering systems under the provisions of [30 V.S.A. § 248]," id. § 8010(c)(3).  "Net metering system" is defined in part as "a plant for generation of electricity that: (A) is of no more than 500 kW capacity; (B) operates in parallel with facilities of the electric distribution system; (C) is intended primarily to offset the customer's own electricity requirements . . . and (D)(i) employs a renewable energy source . . . ."  Id. § 8002(16).  "Group net metering system" is defined in part as "a net metering system serving more than one customer, or a single customer with multiple electric meters, located within the service area of the same retail electricity provider."  Id. § 8002(10).

¶ 6. After extensive proceedings focused on the question, in October 2020, the hearing officer filed a proposed decision recommending that the Commission deny Portland Street's CPG petition to operate a net-metering system because it would be part of a single plant along with the adjacent Golden Solar facility.[4] On December 23, 2020, the Commission adopted the hearing officer's findings of fact and legal reasoning and denied Portland Street's petition, concluding that the Portland Street facility would be part of a single plant along with the adjacent, approved Golden Solar facility.

¶ 7. The Commission began its discussion by acknowledging and explaining its expanded and refined analysis of the single-plant issue. The Commission pointed out that the Legislature enacted the statutory definition of "plant," primarily with wind facilities in mind, to encourage the dispersed siting of energy-generating projects applying for financial incentives available only to smaller facilities. The Commission recognized that the recent proliferation of 500-kW net-metering projects and the advent of preferred siting constraints and grid concerns had driven uneven development, leading to a saturation of solar facilities in particular areas on particular types of sites. The Commission stated that it was faced with the task of applying the

---

[4] In response to Portland Street's application, the Department of Public Service asked the Commission to order Portland Street to provide additional information relevant to the single-plant analysis. After a period of information gathering and written comments by the parties focused on the issue, the Department took the position that the Golden Solar and Portland Street facilities were a single plant. In January 2020, a hearing officer filed a first proposed decision recommending that the Commission deny Portland Street's CPG petition for a net-metering facility because the Portland Street facility would be part of a single plant along with the Golden Solar facility and thus would not satisfy the applicable net-metering eligibility criteria. In March 2020, in response to the parties' comments on the hearing officer's first proposed decision, the Commission ordered the hearing officer to file a second proposed decision after the parties had had an opportunity to provide additional evidence and legal briefing on the single-plant issue. The hearing officer subsequently denied Portland Street's April 2020 motion for summary judgment on the single-plant issue, and in August 2020 the Commission upheld that ruling. As the hearing officer later noted in a proposed decision, the Department took a more equivocal position on the single-plant issue in responding to Portland Street's motion for summary judgment.

statutory single-plant test in the context of this shifting landscape and accompanying policy concerns.

¶ 8. The Commission observed that large projects otherwise too big to benefit from the standard-offer or net-metering programs were being proposed as independent smaller facilities to take advantage of those programs' economic incentives intended for smaller projects. In the Commission's view, such proposals, if successful, would conflict with the purpose of the definition of "plant" in § 8002(18)—to ensure that larger projects do not take advantage of limited financial incentives intended for small and moderately sized projects. The Commission acknowledged that in this context, its analysis of what constitutes a single plant was evolving in order to adhere to the purpose underlying the statutory definition of "plant."

¶ 9. The Commission explained that its analysis under § 8002(18) consisted of two parts. First, it asked whether the facilities are part of the same "project," considering "common ownership, contiguity in time of construction, and physical proximity." Second, it asked whether the facilities "share common equipment and infrastructure." With respect to the argument that if the proposed facility is "an independent technical facility," it is not part of the same plant, the Commission explained, "a finding that a plant is 'an independent technical facility' is not a separate prong to the analysis; it is the conclusion."

¶ 10. As to the first factor within the first prong, the Commission rejected the "legal fiction" that facilities owned by two distinct LLCs do not have common ownership, and instead considered the "actors, operations, and contractual arrangements for each facility" in assessing common ownership. It concluded that the two facilities here were subject to common ownership. In assessing whether facilities shared contiguity in time of construction, the Commission construed "construction" to incorporate all steps in the process, from project planning and site reconnaissance and preparation to physical plant construction and interconnection. In this case, the Commission concluded that the facilities resulted from coordinated, simultaneous planning, and thus concluded

5

that the "contiguity of construction" factor favored a determination that the facilities were part of a single project. Finally, in assessing physical proximity, the Commission held that the number of feet between the facilities was not dispositive, and looked to a number of additional considerations such as intervening buffers and topography. Considering these factors, the Commission concluded that the facilities would be viewed as a single plant from the perspective of the average person and concluded that the physical proximity of the facilities supports the conclusion that they are the same project.

¶ 11. As to the second prong, the Commission considered whether the facilities shared common equipment and infrastructure. The Commission rejected the argument that facilities were legally distinct unless they shared both common equipment and common infrastructure and concluded that it could consider infrastructure beyond where the facility first interconnects to the grid in evaluating whether the facilities use common infrastructure. It stated that its conclusion did not represent a departure from precedent, but also asserted that any evolution in its analysis was allowable given its authority as an administrative agency, and further that its analysis was supported by the legislative intent and policies. The Commission accordingly denied the CPG, and Portland Street appealed.

## II. Analysis

¶ 12. Our standard of review on appeal is deferential. "When the [Commission] evaluates a CPG petition under 30 V.S.A. § 248, it is engaged in a legislative, policy-making process." In re Derby GLC Solar, LLC, 2019 VT 77, ¶ 18, 211 Vt. 144, 221 A.3d 777 (quotation omitted). "Out of respect for the expertise and informed judgment of agencies, and in recognition of this Court's proper role in the separation of powers, we accord agency decisions substantial deference." In re Conservation Law Found., 2018 VT 42, ¶ 15, 207 Vt. 309, 188 A.3d 667. Moreover, we employ a deferential standard of review to an agency's interpretation of statutes within its area of expertise. In re Acorn Energy Solar 2, LLC, 2021 VT 3, ¶ 22, ___ Vt. ___, 251

6

A.3d 899; see also In re Agency of Admin., State Bldgs. Div., 141 Vt. 68, 74-75, 444 A.2d 1349, 1352 (1982) ("[C]onstruction of statutes by those charged with their execution will be followed unless there are compelling indications that the construction is wrong.").

¶ 13.    To be sure, notwithstanding this deferential standard, "we will overturn an agency's interpretation of a statute if there is a compelling indication of an error or if the interpretation is unjust or unreasonable." Acorn Energy Solar, 2021 VT 3, ¶ 23 (quotations omitted); see also In re Stowe Cady Hill Solar, LLC, 2018 VT 3, ¶ 20, 206 Vt. 430, 182 A.3d 53 ("It is well established that we defer to an agency's interpretation of a statute that the agency is tasked with interpreting, though we do not abdicate our responsibility to examine a disputed statute independently and ultimately determine its meaning." (quotations omitted)).  "An agency must operate for the purposes and within the bounds authorized by its enabling legislation, or this Court will intervene." In re Agency of Admin., 141 Vt. at 75, 444 A.2d at 1352.  Ultimately, "[o]ur paramount goal in construing a statute is to give effect to the intent of the Legislature." In re Programmatic Changes to Standard-Offer Program, 2014 VT 29, ¶ 9, 196 Vt. 175, 95 A.3d 999 (quotation omitted).

¶ 14.    Portland Street's arguments on appeal all relate to the Commission's interpretation and application of § 8002(18) of Title 30.  That provision defines "Plant" as follows:

> "Plant" means an independent technical facility that generates electricity from renewable energy.  A group of facilities, such as wind turbines, shall be considered one plant if the group is part of the same project and uses common equipment and infrastructure such as roads, control facilities, and connections to the electric grid. Common ownership, contiguity in time of construction, and proximity of facilities to each other shall be relevant to determining whether a group of facilities is part of the same project.

30 V.S.A. § 8002(18).  The Legislature added the third sentence of the definition in 2014.  See 2013, No. 99 (Adj. Sess.), § 3.  Portland Street's primary argument is that the Commission's decision is inconsistent with this Court's precedent interpreting the statutory definition of "plant," see In re Programmatic Changes, 2014 VT 29, and with the Commission's own resolution of the

7

single-plant issue in recent proceedings involving similar cases. Portland Street also argues that the Commission committed clear error by treating the question whether the proposed facility would be an "independent technical facility" as irrelevant; concluding that the facilities are part of the same project based on common ownership, proximity, and contiguity in the time of construction; and concluding that they share common infrastructure on the basis of the Portland Street distribution line. We consider each argument in turn.[5]

A.  Compatibility With Programmatic Changes and Prior Commission Decisions

¶ 15.  Portland Street first argues that the Commission's decision in this case is inconsistent with the reasoning of this Court's 2014 opinion in Programmatic Changes, the Commission's decision in Investigation into Programmatic Adjustments to the Standard-Offer Program, No. 8817, 2017 WL 4841502 (Vt. Pub. Serv. Bd. Oct. 20, 2017), and its decisions in other recent, similar cases.[6]  We conclude that the Commission's decision in this case can be harmonized with both this Court's precedent in In re Programmatic Changes and the Commission's own decisions, and that any evolution in the Commission's application of the statute is warranted in light of the intervening statutory change and the evolving renewable-energy development landscape.

---

[5]  Without filing a separate notice of appeal, the Department of Public Service filed what it labeled as an appellee's brief in support of Portland Street's position asking us to overturn the Commission's decision.  We do not consider the Department's brief because the Department failed to file a notice of appeal from the Commission's decision.  See In re Snyder Grp., Inc., 2020 VT 15, ¶¶ 6-8, ___ Vt. ___, 233 A.3d 1077 (granting motion to strike City of Burlington's briefs, which were both filed as appellee's briefs even though they supported appellant's position seeking to overturn environmental division's decision, because City failed to file notice of appeal of decision).

[6]  At the time of the Programmatic Changes decision, the Public Utility Commission was named the Public Service Board.  In 2017, the Legislature changed the name from the Public Service Board to the Public Utility Commission.  2017, No. 53, §§ 9-13.  For clarity's sake, we refer to the Commission rather than the Board when discussing cases predating the name change.

## 1. Programmatic Changes

¶ 16. Considering our analysis in <u>Programmatic Changes</u> as well as subsequent developments in the law and renewable generation siting in Vermont, we conclude that the Commission's decision does not reflect clear error and that the Commission acted within its broad discretion.

¶ 17. In <u>Programmatic Changes</u> we reviewed the Commission's determination that the applicant for a proposed solar project did not qualify for the standard-offer program because it, along with another proposed project on the same piece of land with similar interconnection points, constituted a single plant that exceeded the program's 2.2-MW energy-generating-capacity limit. The applicant had argued before the Commission that the two projects were independent technical facilities because, as proposed, they would connect with the electric grid through separate three-phase lines; be separated by a fence; have separate access roads; use separate inverters, transformers, and other equipment; and have different financing parties. The Commission rejected this argument, reasoning that although the two " 'projects may [have been] operationally independent, they [were] being advanced by the same developer, located on the same parcel of land, and adjoining each other.' " <u>Programmatic Changes</u>, 2014 VT 29, ¶ 8 (quoting Commission's decision).

¶ 18. In reversing the Commission's decision, we stated that the statutory definition of "plant" made "no mention of physical proximity or common ownership as relevant factors in determining whether facilities are separate plants," such that the Commission "effectively imposed additional nonstatutory eligibility criteria on potential [standard-offer] project developers without prior notice." <u>Id</u>. ¶¶ 11, 16. Referring to the second prong of § 8002(18)'s second sentence concerning the use of common equipment and infrastructure, we noted that the two projects "will not share common roads, control facilities, or connections to the electric grid," and that they "will have a separate interconnection agreement with [the utility] and separate interconnection facilities

9

designed and owned by [the utility], which would limit the capacity of each [project] to 2.0 MW." Id. ¶ 12.

¶ 19.    Further, we questioned the Commission's concerns that any-sized facilities could be partitioned into independent facilities by including redundant equipment separated only by a fence, noting that the facility would still have to be cost-effective to build, and that the Commission had not cited any evidence indicating the applicant's prices were artificially low due to economies of scale. Id. ¶ 13.  Finally, in response to the Commission's reliance on the Legislature's policy of locating renewable small-to-moderately-sized energy plants across the state's electric grid, we stated that: (1) our interpretation of the statutory definition of "plant" was consistent with the legislative goal of developing renewable energy in a cost-effective manner; and (2) because inclusion of the word "small" in the title of 30 V.S.A. § 8007 concerning plants with a capacity of up to 2.2 MW suggested that a 2.2-MW-maximum capacity plant is a small plant, "[a] cluster of plants totaling 4.0 MW . . . could reasonably be defined as 'moderate' in size." Id. ¶ 14.

¶ 20.    Our analysis in this appeal is informed by two subsequent legal developments. First, days before this Court issued Programmatic Changes, the Legislature passed Act 99, an extensive bill reworking the net-metering program.[7]  In relevant part, Act 99 amended § 8002(18) to include the following provision: "Common ownership, contiguity in time of construction, and proximity of facilities to each other shall be relevant to determining whether a group of facilities is part of the same project."  2013, No. 99 (Adj. Sess.), § 3; see also  30 V.S.A. § 8002(18).  The Legislature's amendment effectively negated a key component of our rationale in Programmatic Changes for reversing the Commission in that case: our conclusion that the Commission was applying nonstatutory criteria in determining whether a group of facilities is part of the same

_____

[7] The Governor signed Act 99 into law on April 1, 2014, and it took effect immediately.

10

project.  We also interpret the amendment as an indication that the Legislature shared the concerns expressed by the Commission in its decision on Programmatic Changes that we reversed.

¶ 21.  Second, in Chelsea Solar we upheld the Commission's denial of a CPG for an amended version of the project originally addressed in Programmatic Changes on the basis that, as amended, the purportedly distinct facilities constituted a single plant.[8]  2021 VT 27, ¶ 2.  We affirmed the Commission's determination that the facilities would use common infrastructure on the basis that the shared distribution line to which both facilities would interconnect was paid for by the developer and would not have existed but for the proposed projects.  Id. ¶¶ 30-32.  And we upheld the Commission's finding that the facilities were part of the same "project"—a term that was undefined in the pre-amendment version of the statute—in light of the evidence that they were developed as part of a common scheme.  Id. ¶ 33.

¶ 22.  In arguing that the Commission's decision in this case is inconsistent with Programmatic Changes, Portland Street focuses on our holding in that case that because the facilities did not share technical features such as equipment and infrastructure, they should be considered separate plants, as well as on our response to the policy considerations that led the Commission to conclude otherwise.  Specifically, Portland Street relies on our statement in Programmatic Changes that our reversal of the Commission's single-plant determination in that case was not inconsistent with the Legislature's expressed goal of " '[p]roviding support and incentives to locate renewable energy plants of small and moderate size in a manner that is distributed across the State's electric grid,' " 2014 VT 29, ¶ 14 (quoting 30 V.S.A. § 8001(a)(7)), because "[t]he title of § 8007 suggests that the Legislature considers 'small' plants to be those with

---

[8] One of the solar projects that was the subject of Programmatic Changes was later renamed Chelsea Solar and evolved into the amended Willow Road project on review in Chelsea Solar.  See Chelsea Solar, 2021 VT 27, ¶¶ 8, 12.  The Commission determined that the Willow Road project, along with an adjoining project proposed by the developer, comprised a single 4.0-MW plant under the statutory definition.  Id. ¶ 1.  We issued our opinion affirming the Commission's decision several weeks after Portland Street filed its brief but before oral argument in this case.

capacities of less than 2.2 MW," further suggesting that "[a] cluster of plants totaling 4.0 MW therefore could reasonably be defined as 'moderate' in size," id.

¶ 23.    We reject Portland Street's critique for three reasons.  First, our policy discussion in Programmatic Changes was tangential to the primary issues raised in that case.  See Chelsea Solar, 2021 VT 27, ¶ 39 (emphasizing that Programmatic Changes rested on fact that the two facilities were not a single plant because they did not share common equipment or infrastructure rather than on Commission's policy analysis).  Second, the Legislature's intervening amendment of § 8002(18) casts a new light on its policy goals and suggests a legislative intent to prevent developers from realizing the benefits of statutory programs targeted at smaller projects by essentially splitting up larger projects into co-located smaller projects with redundant equipment.  In particular, the amendment reinforces that the Legislature shares the policy concerns animating the Commission's current approach.

¶ 24.    Finally, in the decision on appeal, the Commission gave a detailed explanation of the reasons underlying its refined approach to the single-plant analysis.  The Commission acknowledged the "tensions" created in weighing the potential environmental and land-use benefits of co-locating solar facilities against the legislative policy of restricting the standard-use and net-metering programs to small-to-moderately-sized projects dispersed across the state.  The Commission considered this legislative policy in the context of a "shifting landscape" of saturated solar facilities "in particular areas and in particular types of sites" resulting from the increased efforts of solar developers to parse large projects into smaller projects at the same location to take advantage of the financial incentives of programs (while maintaining economies of scale) aimed at benefiting small facilities dispersed across the state.[9]

_____

[9]  In the context of its related argument that the Commission departed from its precedents without providing a reasonable basis for doing so, which we reject below, Portland Street contends that there is no evidence to support the Commission's description of this shifting landscape.  We

12

¶ 25.    These are matters within the expertise of the Commission, which the Legislature has authorized to implement the statutes at issue here.    The fact that the Commission's interpretation and application of the statute does not reflect the only reasonable understanding of the statute does not overcome the Commission's interpretation of statutory language within its expertise that is neither unreasonable nor indicative of compelling error.    And the policy-based challenges to the Commission's refined approach to implementing the Legislature's intent should be directed to the Legislature.

## 2. Commission Precedents

¶ 26.    We likewise conclude that the Commission's reasoning in this case is not reversible on the ground that it conflicts with recent Commission precedent.    Although "we generally expect agencies to provide nonarbitrary reasons for departing from their own established law," the Commission is restrained from departing from precedent only when doing so rests on "arbitrary, unreasonable, or discriminatory" bases.    In re Apple Hill Solar LLC, 2019 VT 64, ¶ 25, 211 Vt. 54, 219 A.3d 1295 ("[A]dministrative agencies are free to depart rather freely from their precedents, and an agency may depart from precedent if it decides that law it has previously

---

disagree.  The very fact that the single-plant issue has arisen in many recent cases involving co-located solar facilities (as cited by Portland Street) belies this contention.  Citing a prior Commission order, the hearing officer in this case found that the Commission had ample evidence that developers were regularly investing in duplicate infrastructure at co-located facilities to gain the benefits of programs targeted at smaller producers while maintaining economies of scale.  As part of its single-plant determination in a decision we affirmed in Chelsea Solar, the Commission acknowledged our comment in Programmatic Changes regarding economies of scale that "it will not always be cheaper or more efficient for plants to be located next to each other."  Programmatic Changes, 2014 VT 29, ¶ 13.  The Commission observed, however, "that the economic benefit of building solar facilities in close proximity outweighs the cost of building redundant infrastructure, and this has been borne out by subsequent practice in the industry," which, contrary to legislative policy, "creates economic advantages for developers because it preserves the financial incentives and size limitations associated with the standard-offer program and the net-metering program, while at the same time achieving economies of scale gained by having facilities in close proximity."  Petition of Chelsea Solar LLC pursuant to 30 V.S.A § 248 for a Certificate of Pub. Good Authorizing the Installation and Operation of the "Willow Road Project," a 2.0 MW Solar Elec. Generation Facility on Willow Rd. in Bennington, Vt., No. 17-5024-PET, 2019 WL 2524170, at *43-44 (Vt. Pub. Util. Comm'n June 12, 2019).

declared is unsound and ought not to be followed." (quotations omitted)). We conclude that the Commission's determination that the single-plant test does not require that facilities share both equipment and infrastructure is not inconsistent with the Commission's analysis in a 2017 decision, and that its analysis of the question whether the two facilities constitute one project does not improperly contradict its analyses in a number of cases cited by Portland Street.

### a. Investment into Programmatic Adjustments

¶ 27. We reject Portland Street's argument that the Commission ignored its analysis in Investigation into Programmatic Adjustments to the Standard-Offer Program, No. 8817, 2017 WL 4841502 (Vt. Pub. Serv. Bd. Oct. 20, 2017), by attributing different meanings to multiple uses of the word "and" in the second sentence of § 8002(18). That sentence provides: "A group of facilities, such as wind turbines, shall be considered one plant if the group is part of the same project and uses common equipment and infrastructure such as roads, control facilities, and connections to the electric grid." 30 V.S.A. § 8002(18). In Portland Street's view, by determining in its 2017 decision that the first "and" in the sentence created a two-prong test for determining whether proposed projects are a single plant, the Commission established a precedent for its interpretation of the meaning of all three uses of "and" in the sentence, which it defined in this case by interpreting the second "and" in the sentence in a disjunctive sense. We disagree.

¶ 28. In determining in its 2017 decision that § 8002(18) creates a two-prong test for the single-plant issue, the Commission relied on the Legislature's normal conjunctive use of the first "and" in the second sentence and the fact that the additional factors in the third sentence added by Act 99 explicitly applied only to the first prong of the test—whether the proposed projects are part of the same project. Investigation into Programmatic Adjustments, 2017 WL 4841502, at *10.[10]

---

[10] The Commission also quoted this Court's statement in Programmatic Changes that "[t]he logical corollary of the second sentence is that facilities that are not part of the same project and do not share equipment and infrastructure should be considered separate plants." 2014 VT 29, ¶ 10.

In its decision under review in this appeal, the Commission addressed the second "and" in the sentence, concluding that the phrase immediately following the words "common equipment and infrastructure"—"such as roads, control facilities and connections to the electric grid"—provides examples of what could be considered either common equipment or common infrastructure and thus does not require that there be both common equipment and common infrastructure to satisfy that prong of the test. In other words, "equipment and infrastructure" describes a single category of components such as roads, control facilities, and grid connections, rather than two distinct requirements.

¶ 29. The Commission acknowledged that the word "and" is most often used in its conjunctive sense but noted that courts have recognized exceptions to this rule. See United States v. Fisk, 70 U.S. 445, 447 (1865) (observing that in ascertaining legislative intent, "courts are often compelled to construe 'or' as meaning 'and,' and again 'and' as meaning 'or' "); cf. State v. Turner, 2021 VT 30, ¶ 10, ___ Vt. ___, 254 A.3d 204 ("Although the word 'or' is most often used in the disjunctive, it can also be used in the conjunctive, meaning 'and.' "). The Commission also stated that the unintended practical effect of construing the second "and" in its conjunctive sense would be to allow developers of large projects to easily satisfy the single-plant test by sharing significant infrastructure while avoiding sharing equipment such as transformers, thereby gaining a financial advantage over smaller facilities meant to benefit from the standard-proof and net-metering programs.

¶ 30. The fact that the Commission construed the second "and" in the second sentence of the statutory definition of "plant" differently than it had previously construed the first "and" in the sentence in a different context does not demonstrate that it failed to follow its precedent. Further,

the Commission's construction of the second "and" is neither unreasonable nor indicative of compelling error.[11]

### b. Other Recent Commission Precedent

¶ 31.    We likewise reject Portland Street's argument that the Commissioners' decision here is inconsistent with other recent Commission decisions approving small renewable-energy facilities located on the same parcel of land and proposed by the same developer.  The cases relied upon by Portland Street do not undermine the Commission's decision in this case and, as set forth more fully below, the Commission's decision in this case is not impermissibly inconsistent with those decisions.

¶ 32.    Portland Street first cites simultaneously filed but separate June 2018 CPG petitions to locate three net-metered roof-top solar facilities on adjacent buildings at the Blodgett plant in Burlington.  The Burlington Electric Department represented to the Commission that the three facilities were adjacent and would exceed the net-metering program's 500-kW maximum energy capacity if the facilities were part of the same plant under the statutory definition.  In response to the Commission's request for additional information on this point, the applicants stated that the facilities would not share any common equipment or infrastructure and would have separate points of interconnection, control facilities, and access.  In support of their response, the applicants provided a site-plan map depicting the facilities.  The Commission approved the CPGs after stating in a single sentence that it had reviewed the additional information provided by the applicants and determined that the three facilities were not a single plant because they did not share any common

---

[11]  In Chelsea Solar, we declined to address the developer's unpreserved assertion "that to be a single plant, facilities must use 'common equipment _and_ infrastructure' " but noted "that the key question as identified in Programmatic Changes is whether the facilities 'share technical features _such as_ equipment and infrastructure,' using these as examples rather than requiring a showing of both."  Chelsea Solar, 2021 VT 27, ¶ 35  (quoting Programmatic Changes, 2014 VT 29, ¶ 10) (emphasis added).

16

equipment or infrastructure.[12]  See Application of Solar 32 LLC for a Certificate Pub. Good for a 30 kW Solar Net-metered Elec. Power Sys. in Burlington, Vt., No. 18-1767-NMR, Application of BOC SOLAR LLC for a Certificate of Pub. Good for a 400 kW Solar Net-metered Elec. Power Sys. in Burlington, Vt., No. 18-1768-NMR, Application of Lakeside Avenue Solar, LLC for a Certificate of Pub. Good for a 400 kW Solar Net-metered Elec. Power Sys. in Burlington, Vt., No. 18-1769-NMR, 2018 WL 4851430 (Vt. Pub. Util. Comm'n Sept. 27, 2018).  A single-sentence determination like that does not establish a precedential policy that the Commission failed to follow in this case.  As the Commission explained here in the hearing officer's proposal that the Commission adopted, in previous cases the Commission relied solely on the testimony of the developers that their facilities were not a single plant under the statutory definition.

¶ 33.    In this case, the Commission noted the difficult task of determining whether projects constitute a single plant, given developers' lack of incentive to inform the Commission that a proposed facility would be co-located with another facility, and acknowledged that at times it has relied on the candor of an applicant who has made a conclusory statement that a facility is not part of a single plant.  The Commission explained that it had taken a more proactive role in requiring applicants to submit additional information on co-located facilities.  We agree with the Commission that cases such as these do not demonstrate that in this case the Commission departed from policy it had established in the earlier cases.

¶ 34.    Likewise, we reject Portland Street's argument that the Commission's decision in this case amounted to a departure from its single-plant analysis in Application of SolarSense VT

---

[12] The Commission similarly approved CPGs with little analysis based on applicants' representations in the Shephard Wind and South Ridge Solar Park cases cited by Portland Street. See Application of Ralph Shepard for a Certificate of Pub. Good for a 25.0 kW Wind Elec. Power Sys. in Ferrisburgh, Vt., No. 20-3382-NM, 2020 WL 7082727 (Vt. Pub. Util. Comm'n Nov. 23, 2020); Petition of S. Ridge Solar Park, LLC, for a Certificate of Pub. Good, pursuant to 30 V.S.A. §§ 8010 and 248 and Commission Rule 5.100, to Install and Operate a 500 kW Grp. Net-Metered Solar Elec. Generation Facility in Middlebury, Vt., No. 18-2621-NPM, 2019 WL 194913 (Vt. Pub. Util. Comm'n Jan. 10, 2019).

17

XXVII, LLC for a Certificate of Pub. Good, pursuant to 30 V.S.A. §§ 248 and 8010 and Rule 5.100, for a 250 kW (AC) Solar Net-metering Sys. in Concord, Vt., No. 19-2132-NMP, 2019 WL 5822169 (Pub. Util. Comm'n Oct. 31, 2019). As the Commission explained in responding to Portland Street's argument on this point, in that case the access road shared by the co-located facilities pre-existed both solar facilities on the site, in contrast to this case, and thus did not constitute common infrastructure.

¶ 35. Finally, the case of Kirchheimer Solar, in which the Commission apparently granted an amended CPG for a net-metering facility shortly after denying the CPG in this case, is readily distinguishable.[13] The Kirchheimer Solar case presented an unusual fact pattern insofar as both the projects at issue had already been built. The hearing officer in that case concluded that common-ownership considerations weighed slightly against finding common ownership because, although the facilities were commonly owned, different parties contractually benefitted from the projects, which were located on different parcels under different leases, and which were neither designed nor constructed together. The Commission's analysis of the single-plant issue in this case was not a fundamental departure from the hearing officer's analysis in Kirchheimer Solar.

¶ 36. In sum, Portland Street has not established that the Commission substantially or unreasonably departed from established precedent concerning the single-plant issue. The extent to which outcomes in past Commission cases do not comport with the outcome in this case is due primarily to a lack of focus on the single-plant issue or distinguishable facts, and not the Commission's departure from established precedent.

---

[13] Portland Street states that the Commission issued a December 17, 2020 decision granting an amended permit, but cites only to the hearing officer's proposed decision recommending that the Commission grant the amended permit. As we conclude above, the hearing officer's reasoning, assuming it was accepted by the Commission, does not demonstrate that the Commission in the instant case fundamentally departed from a previously established analysis of the single-plant issue.

## B. Independent Technical Facility

¶ 37.    As noted above, 30 V.S.A. § 8002(18) provide as follows:

> "Plant" means an independent technical facility that generates electricity from renewable energy. A group of facilities, such as wind turbines, shall be considered one plant if the group is part of the same project and uses common equipment and infrastructure such as roads, control facilities, and connections to the electric grid. Common ownership, contiguity in time of construction, and proximity of facilities to each other shall be relevant to determining whether a group of facilities is part of the same project.

¶ 38.    Portland Street argues that, by treating the first sentence defining a plant as "an independent technical facility" as irrelevant surplusage in this case, the Commission deviated from both this Court's Programmatic Changes opinion and the Commission's 2017 Standard-Offer Program decision, which require the Commission, in addressing the single-plant issue under § 8002(18), to consider primarily technical features such as control facilities, electrical connections to the grid, and limited-energy-capacity agreements. Portland Street contends that the two-part test reflected in the second and third sentences of the definition of "plant" does not supplant consideration of whether, based on an assessment of the mechanical elements of proposed generating facilities, they are "independent technical facilities." The Commission, on the other hand, concluded that whether a facility is an independent technical facility is essentially a conclusion based on application of the two-prong test in the second and third sentences of § 8002(18) rather than a distinct and independent factor.

¶ 39.    The Commission's interpretation is reasonable when the statute is read in its entirety. The first sentence of § 8002(18) provides that a plant is "an independent technical facility," and then the next two sentences establish a two-prong test for determining whether facilities should be considered a single plant or independent facilities. In effect, Portland Street would have us read into the first sentence the phrase, "a technically independent facility," rather than the actual phrase, "an independent technical facility," essentially ignoring the nontechnical

criteria set forth in the statutory definition. Moreover, the concept of "technical" independence, as described by Portland Street, is largely subsumed within the "common equipment and infrastructure" prong of the analysis. For these reasons, the first sentence of § 8002(18) does not compel a determination that multiple facilities are a single plant as long as the developers arrange for each facility to have separate inverters and electrical connections to the grid and obtain separate interconnection agreements that limit the energy capacity of each individual facility to that allowed under the standard-offer and net-metering programs. The statutory considerations are whether the facilities are part of the same project considering the factors listed and whether they use common equipment and infrastructure such as "roads, control facilities, and connections to the electric grid." Id. Technical independence alone is insufficient to establish that two facilities are separate plants. Nothing in either our Programmatic Changes opinion, which was decided before the statutory amendment to § 8002(18), or the Commission's 2017 Standard-Offer Program decision, compels a contrary interpretation.

## C. Same Project

¶ 40.   As noted, after we concluded in Programmatic Changes that the Commission erred in considering physical proximity and common ownership as relevant factors in determining whether facilities are separate plants because § 8002(18) did not mention these factors, see Programmatic Changes, 2014 VT 29, ¶¶ 11, 16, the Legislature amended the definition of "plant" to include the following sentence: "Common ownership, contiguity in time of construction, and proximity of facilities to each other shall be relevant to determining whether a group of facilities is part of the same project." 30 V.S.A. § 8002(18). The Commission considered the policy this amendment sought to vindicate, in addressing each of these three factors in determining whether Portland Street and Golden Solar should be considered a single project. Portland Street argues that the Commission committed compelling error and exceeded its statutory authority by expansively construing precise terms set forth in the third sentence, beyond what the Legislature intended. We

20

conclude, with respect to each of these factors, that the Commission acted within its authority and reasonably interpreted the terms contained in § 8002(18), which the Legislature charged it with implementing.

### a. Common Ownership

¶ 41. The hearing officer recommended that the Commission find common ownership in this case because the two corporate principals for both Norwich Technologies and Sunny Acres—the owner of the 82.2-acre parcel on which the Portland Street and Golden Solar facilities are to operate—controlled both Portland Street and Golden Solar. The hearing officer found that the two facilities were part of a plan to have separate LLCs own separate facilities on the same site, which would allow the facilities to satisfy energy-capacity limits established in the standard-offer and net-metering programs. The Commission adopted the hearing officer's findings and conclusions, including those concerning common ownership.

¶ 42. In assessing the common-ownership factor, the Commission considered, among other things, who developed the projects, owned the completed projects, owned the project site, and leased the land to whom. The Commission declined to resolve the question of common ownership based solely on the fact that two distinct corporate entities owned the respective facilities. The Commission explained that doing so would effectively negate the common-ownership factor, contrary to legislative intent, because developers typically form separate LLCs for each facility, particularly those with an energy capacity above 150 kW. Accordingly, the Commission determined that the term "common ownership" requires an analysis of the actors, operations, and contractual arrangements for each facility, rather than relying solely on corporate status.

¶ 43. Portland Street does not challenge the Commission's factual findings concerning the relationship between the facilities but argues that because the two facilities at issue in this case are separate legal entities owned by separate LLCs, they are not commonly owned. According to

21

Portland Street, the Commission exceeded its statutory authority by considering nonstatutory elements, such as who controlled the LLCs involved with the projects, in determining that the separately owned facilities are not in fact separately owned.

¶ 44. We disagree. The Commission could reasonably conclude, given the broad language and purpose of the amendment, that the Legislature intended for the Commission to consider whether the individuals or entities that ultimately own two facilities are the same rather than whether the facilities are nominally held by distinct LLCs. Otherwise, very few if any plants would have common ownership, and the Legislature's recent statutory amendment to include "common ownership" as a factor in the "same project" analysis would be meaningless. See In re Mountain Top Inn & Resort, 2020 VT 57, ¶ 37, ___ Vt. ___, 238 A.3d 637 ("We consider the whole and every part of the statute and avoid a construction that would render part of the statutory language superfluous." (citations and quotations omitted)); cf. In re Investigation to Review the Avoided Costs that Serve as Prices for the Standard-Offer Program in 2019, 2020 VT 103, ¶ 31, ___ Vt. ___, 251 A.3d 525 (concluding that demonstrating site control in favor of one wholly owned subsidiary of parent company was sufficient to establish site control in favor of another wholly owned subsidiary of same parent company because the wholly owned subsidiaries are like "a multiple team of horses drawing a vehicle under the control of a single driver" (quotation omitted)). Accordingly, the Commission acted within its delegated authority when it reasonably construed the term "common ownership" to include an examination of the elements of control and interest beyond the formal corporate status of the immediate owner of each facility.

b. Contiguity in Time of Construction

¶ 45. The Commission adopted the hearing officer's recommendation that the Commission conclude that Portland Street and Golden Solar were the product of coordinated, simultaneous planning by a common owner based on Norwich Technologies' funding of a single survey of endangered plants conducted for the entire project site and on the utility's reconductoring

of 4500 feet of a distribution line to serve both facilities. The hearing officer determined that actions such as these, which were relied upon in both facilities' CPG petitions, were indicative of the common owner's plan for development of a single project. The hearing officer pointed out that both facilities could have been under construction at the same time if the Portland Street facility had been approved on the accelerated schedule requested, but that, in any event, the word "contiguous" is defined, in part, as "[n]ear in time or sequence; successive." Contiguous, Black's Law Dictionary (11th ed. 2019).

¶ 46. Analogous to its common-ownership analysis, in assessing the contiguity-in-time-of-construction factor, the Commission declined to reduce the inquiry to whether both projects had "shovels in the ground" simultaneously. Rather, the Commission considered all construction steps, including project planning, site reconnaissance and preparation, physical plant construction, and interconnection. In the Commission's view, project construction begins when an applicant takes affirmative, identifiable steps beyond mere rumination toward bringing a facility into being. The Commission pointed out that this analysis is reinforced by the requirement that an applicant obtain a CPG before beginning site preparation. See 30 V.S.A. § 248(a)(2)(A) (providing that "no company . . . may begin site preparation for construction of an electric generation facility . . . unless the Public Utility Commission first finds that the same will promote the general good of the State and issues a certificate to that effect").

¶ 47. Portland Street counters that by looking beyond whether there was an overlap in actual construction in interpreting the contiguity-in-time-of-construction factor, the Commission exceeded the scope of its statutory authority. It invokes our decision in In re Agency of Administration, 141 Vt. 68, 444 A.2d 1349 (1982), to support its contention that construing "contiguity in time of construction" to include development activities exceeds the scope of the statute and is clearly erroneous.

¶ 48. Again, we disagree. The Commission's interpretation of this factor is reasonable and does not undermine the statute's underlying purpose; on the contrary, the Commission sought to further the statute's underlying purpose of limiting the benefits of the standard-offer and net-metering programs to genuinely independent projects. Cf. Chelsea Solar, 2021 VT 27, ¶ 33 (concluding, in considering whether facilities were part of same project before statutory amendment adding "contiguity of construction" factor, that where "facilities were pursued and developed as part of a common scheme," they "did not need to be literally built at the same time" to be considered as same project).

¶ 49. Our analysis in Agency of Administration, 141 Vt. 68, 444 A.2d 1349 does not suggest otherwise. The issue in that case was whether the state's demolition of a house within the area contemplated for potential construction of a "capitol complex" constituted the "commencement of construction" on a state project involving more than ten acres of land so that it was thereby subject to Act 250, Vermont's land-use and development law. Id. at 74, 444 A.2d at 1351. Reviewing the statute's legislative history, including the history of the specific language referencing "construction" as an indicium of "development," thereby triggering Act 250 jurisdiction, this Court concluded that the "legislative history discloses a well-considered intent on the part of the Legislature to define as 'development' only that activity which has achieved such finality of design that construction can be said to be ready to commence." Id. at 79, 444 A.2d at 1354. Upon determining that many of the Board's factual findings were clearly erroneous, we concluded that the razing of the building was not part of an established plan to develop the site. Id. at 91, 444 A.2d at 1361. In that context, we considered the Environmental Board's implementing regulation that defined "construction of improvements" to include "any activity which extends, modifies, or initiates any use of the land," other than activities principally for the purpose of preparing plans or applying for a permit. Id. at 92, 444 A.2d at 1361 (quotation omitted). We concluded that the Board's definition was overbroad in light of the narrower

24

language of the statute, and that there was no reasonable connection between an isolated demolition project and the Act 250 purpose of determining the suitability of land for large-scale development. Id. at 93, 444 A.2d at 1361-62.

¶ 50.    In this case, there is no comparable history suggesting that the statutory focus on "construction" reflected a legislative compromise designed to limit the circumstances in which the "contiguity in time of construction" factor might apply. To the contrary, for the reasons set forth above, the circumstances surrounding the Legislature's adoption of that factor and the Legislature's apparent goals in adding the consideration, support the Commission's conclusion that the factor is designed to ferret out projects in which multiple facilities are constructed as part of a common plan under common ownership.

### c. Proximity of Facilities to Each Other

¶ 51.    The Commission accepted the hearing officer's recommendation that it consider the physical proximity of the Portland Street and Golden Solar facilities in support of a determination that they are part of the same project. The hearing officer concluded that the Commission, in analyzing the proximity of facilities in prior cases to determine whether they were the same project, had considered: the distance between the facilities, without arriving at any "magic number"; intervening buffers such as fences, waterways, forest or vegetation, roads, and building or structures; and topography. With these features in mind, the hearing officer found that: (1) Portland Street would be located approximately 100 feet south of the Golden Solar fence line; (2) the array rows of the two facilities would run parallel to each other east to west; (3) the northernmost array of the Portland Street facility would be approximately 180 feet south of the Golden Solar facility; and (4) that no natural boundaries separated the two facilities. The Commission found that "[t]o an observer, the two facilities would appear as the same project."

¶ 52.    For its part, the Commission emphasized that its assessment of physical proximity was not merely a calculation of the distance between facilities but rather required an examination

of the features noted by the hearing officer. Based on its consideration of these features, the Commission adopted the hearing officer's recommendation that the proximity-of-the-facilities-to-each-other factor supported a same-plant determination.

¶ 53. Portland Street does not challenge the Commission's underlying findings but argues on appeal that arrays separated by 180 feet are not very close in space consistent with the word "proximate" and that the Commission's reference to whether a reasonable observer would consider multiple projects one facility created an arbitrary standard. We agree that the perception of a reasonable observer has no bearing on any statutorily relevant consideration, as the purpose of the "proximity" factor here is not to promote an aesthetic goal but rather to help distinguish genuinely independent smaller projects from larger projects carved into smaller components for the purpose of accessing the statutory benefits available to smaller developments. Nevertheless, we conclude that the Commission did not abuse its discretion in determining, based on a totality of factors—including the topography and absence of natural barriers between the two facilities—that these two facilities are near enough in space to support the conclusion that they are a single project. See Proximity, Black's Law Dictionary (11th ed. 2019) ("The quality, state, or condition of being near in time, place, order, or relation."). Because the Commission's assessments of the common ownership, contiguity of construction, and proximity are supported by the record and consistent with its statutory authority, its overall conclusion based on the totality of these factors that the two facilities are part of the same project is not an abuse of discretion.

D. Common Equipment and Infrastructure

¶ 54. The second prong of the single-plant test asks whether the facilities use common equipment or infrastructure "such as roads, control facilities, and connections to the electric

grid."[14]    30 V.S.A. § 8002(18).    Here, the Commission accepted the hearing officer's recommendation that the Commission conclude that the Portland Street and Golden Solar facilities share common equipment and infrastructure based on the following findings concerning the facilities' shared roads, control facilities, and connections to the electric grid: (1) the facilities share the same access road; (2) access to the Portland Street facility would be via a 100-foot extension of the 1760 feet of access road improved for the Golden Solar facility; (3) reconductoring of 4500 feet of distribution line is needed in its entirety before interconnection of either facility may occur; and (4) each facility has separate overhead lines that run from the transformer adjacent to the solar field along the access road to separate poles of an upgraded utility three-phase distribution system.    While acknowledging that the facilities would have separate points of interconnection with the electric grid at separate poles, the hearing officer concluded that the common infrastructure analysis was not limited to the points of connection to the grid but rather extended to the 4500-foot reconductored distribution line.  In reaching this conclusion, the hearing officer relied on the Commission's recent decision in  Willow Road, in which it concluded that the mile-long Green Mountain Power extension line that both facilities relied on was "a single interconnection facility" for the two projects at issue in that case.[15]

¶ 55.    In accepting the hearing officer's recommendation concerning this prong of the single-plant test, the Commission rejected Portland Street's argument that any infrastructure shared beyond the pole where the facility first interconnects to the electric grid cannot be considered shared infrastructure.  The Commission stated that if this were the case, facilities could share hundreds of thousands of dollars of distribution line extensions or upgrades without those

---

[14]  As set forth more fully above, we conclude that the Commission's determination that this prong of the statute is satisfied if the facilities share common equipment or common infrastructure, and that they need not share both, is not clearly erroneous.  See supra, ¶¶ 28-30.

[15]  We reviewed the Willow Road decision on appeal under the caption In re Chelsea Solar, 2021 VT 27, ¶ 12.

upgrades being considered "shared" infrastructure merely because the facilities' first point of connection was separate. Rather, the Commission followed the approach it had articulated in its Willow Road decision and applied a "but-for" test that considered whether either facility could connect to the electric grid but for the existence of a shared distribution line. For purposes of this analysis, the Commission distinguished between preexisting infrastructure, such as an access drive or distribution circuit, and infrastructure and equipment that is built, altered, or improved for the projects. Finally, the Commission stated that its forewarning in its Programmatic Changes decision that the profits of a group net-metering project could far outweigh the costs of redundant infrastructure had been realized, and that an application showing overlap between proposed facilities with respect to an environmental impact analysis, interconnection studies, roads, and electric infrastructure upgrades raised "the ultimate red flag" in considering whether the proposed facility was part of a single-plant.

¶ 56. Portland Street argues that the Commission's analysis is flawed because the utility's reconductored distribution line to which both facilities interconnect is not a shared interconnection facility. The facilities in this case had separate "control facilities" limiting their respective energy-generating capacities in the form of project inverters, transformers, and interconnection agreements. Portland Street notes that the Commission's Interconnection Rule 5.500 draws a clear distinction between interconnection facilities and a utility's system upgrades and that the utility's interconnection line is an interconnection to the electric grid.

¶ 57. In our recent decision in Chelsea Solar, we affirmed the Commission's rejection of these arguments. See 2021 VT 27, ¶¶ 29-30 (upholding as reasonable Commission's determination that, notwithstanding facilities' separate points of interconnection to new mile-long extension, facilities used common equipment). In Chelsea Solar we explained that the ownership of the distribution line to which both facilities connected was not dispositive because § 8002(18) speaks to the use of common infrastructure. Id. ¶ 31. Where the shared distribution line was paid

28

for by the developer and would not otherwise exist but for this project, it amounted to common infrastructure used by the utilities. Id. Likewise, here the reconductored distribution line was not preexisting grid infrastructure, was necessary for both facilities' interconnections, and was paid for by the developer. Moreover, the access road to the Portland Street facility was an extension of the access road improved for the Golden Solar facility. Given these facts, we cannot conclude that the Commission's determination that the facilities use common infrastructure is clearly erroneous.

¶ 58. We acknowledge Portland Street's argument that making a single-plant determination based on a single shared line extension or access road would mean that virtually all proposed co-located facilities would be considered a single plant, in contravention of important land-use and environmental policies. This argument fails to recognize, however, that both prongs of § 8002(18)'s single-plant test have to be satisfied for the Commission to determine that a proposed facility is part of a single plant. See Chelsea Solar, 2021 VT 27, ¶ 32. As noted above, to the extent Portland Street argues that the Commission's application of the statute creates perverse incentives from a land-use and environmental perspective, those arguments should be directed to the Legislature.

## III. Conclusion

¶ 59. We recognize, as did the Commission, that in recent cases the Commission has expanded and refined its analysis of the single-plant test contained in § 8002(18). The Commission states that it has done so to address a growing and evolving solar-development industry that, in the Commission's view, has increasingly sought to secure the benefits of statutory regimes not intended for larger projects by breaking up larger projects into smaller ones. The Legislature has driven and reinforced the Commission's approach by amending § 8002(18) to more clearly identify the harm it seeks to remedy. The Commission views itself as a gatekeeper tasked with applying the screening mechanism that the Legislature established in § 8002(18) to determine

29

whether large projects have been segmented into smaller projects to gain financial incentives under programs intended for the benefit of smaller projects, in contravention of legislative policy.

¶ 60.    As explained above, we conclude that the Commission in this case acted within its statutory authority and reasonably construed the component parts of § 8002(18) in the context of a CPG petition seeking the benefits of the net-metering program.    Ultimately, however, the Legislature will determine if the Commission's refined interpretation of the statute aligns with ever-evolving legislative policies concerning land use and renewable energy.

Affirmed.

FOR THE COURT:

Associate Justice

30