NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: Reporter@vtcourts.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2025 VT 65

No. 24-AP-374

| | |
|---|---|
| In re Petition of Otter Creek Solar LLC | Supreme Court |
| | On Appeal from<br>Public Utility Commission |
| | September Term, 2025 |

Edward McNamara, Chair

Michael Melone, Allco Renewable Energy Inc., New Haven, Connecticut, for Appellant.

Ben Civiletti, Special Counsel, Vermont Department of Public Service, Montpelier, for Appellee.

PRESENT: Reiber, C.J., Eaton, Cohen and Waples, JJ., and Zonay, Supr. J., Specially Assigned

¶ 1. **EATON, J.** Appellant, Otter Creek LLC, sought to construct a solar facility in Bennington, Vermont and applied to the Public Utility Commission for a Certificate of Public Good (CPG). The Commission denied the CPG, concluding that the proposed new plant together with an existing nearby solar facility constituted a single plant which exceeded the plant-capacity of the Standard Offer Program and was therefore ineligible for it. Otter Creek appeals, arguing that the Commission applied the wrong test to determine if its facility was a single plant, that the Commission should not have applied the single-plant test during the CPG determination, that the Commission's decision violates its due process rights, and that it is entitled to a new hearing. We conclude that the Commission applied the correct standard and acted within its discretion in denying the CPG, and therefore affirm.

## I. Legal Background

¶ 2.     Some background on the applicable statutes is helpful to understanding the issues. One of Vermont's general policies is "[t]o ensure to the greatest extent practicable that Vermont can meet its energy service needs in a manner that is adequate, reliable, secure, and sustainable." 30 V.S.A. § 202a.   To achieve this, the Legislature has specific "[r]enewable energy goals" including "[p]roviding support and incentives to locate renewable energy plants of small and moderate size" across the state "including locating such plants in areas that will provide benefit to the operation and management of that grid through such means as reducing line losses and addressing transmission and distribution constraints." Id. § 8001(a)(7).

¶ 3.     The Standard Offer Program furthers this goal by requiring Vermont distribution utilities to buy renewable power from an eligible renewable-energy plant for a set price and amount of time.  Id. § 8005a(f)(4), (e).   To incentivize small- and moderate-size plants, the program is available to a renewable-energy plant only if it "has a plant capacity of 2.2 MW or less."  Id. § 8005a(b).   The statute defines "plant" and lists factors relevant to whether a group of nearby facilities are part of the same plant for the purpose of the statute: common equipment and infrastructure, common ownership, contiguity in time of construction, and proximity of the facilities to each other. Id. § 8002(18).

¶ 4.     If a new renewable energy facility submits a proposal for a standard-offer contract from the Commission and is awarded that contract, the facility must also apply for and receive a CPG from the Commission to begin construction. Id. § 248(a)(2)(A)-(B) (stating no company or person "may begin site preparation for or construction of an electric generation facility, energy storage facility, or electric transmission facility within the State that is designed for immediate or eventual operation at any voltage . . . unless the [Commission] first finds that the same will promote the general good of the State and issues a certificate to that effect").

2

## II. Facts and Procedural History

¶ 5.    The following facts are undisputed unless otherwise noted.  In 2016, the Commission issued requests for proposals (RFP) for the Standard-Offer Program based on its annual available capacity.  See 30 V.S.A. § 8005a.  Otter Creek, LLC submitted three project bids in response to the RFP solicitation.  Those projects were originally named Battle Creek 1, Battle Creek 2, and Battle Creek 3.  Each of the proposed projects would be located off Rice Lane in Bennington on adjacent parcels of land between Hardwood Hill Road and North Bennington Road.  Battle Creek 1 was the western-most proposed project.  At its closest point, Battle Creek 2 would be located 150 feet to the east of Battle Creek 1.  Battle Creek 3 would be located to the north and east of Battle Creek 1 and 2, closer to Rice Lane.  All facilities planned to interconnect to the grid on Rice Lane.

¶ 6.    The Commission awarded Battle Creek 1 a standard-offer contract but did not offer a contract to the other two proposed facilities at that time.  Otter Creek subsequently applied for and received a CPG for Battle Creek 1, then-renamed "Battle Creek Solar," from the Commission pursuant to 30 V.S.A. § 248.  To bring Battle Creek into operation, a number of upgrades were performed to allow it to safely connect to Green Mountain Power's (GMP) distribution lines.  This included the construction of a three-phase distribution line, funded by Battle Creek, that ran west from the Battle Creek Solar facility along Rice Road and ultimately to a GMP substation.[1]  Battle Creek Solar began operating in September 2019.

¶ 7.    While Battle Creek was being constructed, Otter Creek re-submitted proposals for Battle Creek 2 and Battle Creek 3 in response to the Commission's 2018 RFP solicitation.  At that point, Battle Creek 2 and 3 had been renamed Warner Solar and Stark Solar.  In total, the

---

[1]  Otter Creek disputes the Commission's finding that Battle Creek funded the upgrade, arguing that it is entitled to a refund.  We address that argument below.  See infra, ¶ 30 n.4.

3

Commission received fourteen proposals in response to its 2018 RFP process and it selected four solar-facility proposals for standard-offer contracts. Warner Solar and Stark Solar were both awarded contracts. The Commission rejected the other proposals submitted for a variety of reasons. Relevant to this case, the Commission rejected a proposal for a dam facility because the Commission determined that it would be considered the "same plant" with a nearby existing dam and because, as a result, the combined energy production would exceed the 2.2 MW limit for a standard-offer contract. See 30 V.S.A. § 8005a (restricting standard-offer program eligibility to renewable energy plants with "a plant capacity of 2.2 MW or less").

¶ 8.    After receiving standard-offer contracts for both Warner Solar and Stark Solar, Otter Creek petitioned the Commission for a CPG for each facility. In response to the petitions, the assigned hearing officer requested supplemental information about whether any combination of Battle Creek Solar, Warner Solar, and Stark Solar were a "single plant" for the purpose of 30 V.S.A. § 8002(18). The hearing officer then stayed its determination regarding both facilities until a final decision was issued by this Court concerning the single-plant issue in In re Chelsea Solar LLC, 2021 VT 27, 214 Vt. 526, 254 A.3d 156. After Chelsea Solar was decided, the hearing officer again stayed the Warner Solar case pending resolution of the single-plant issue in Stark Solar. Ultimately, the Commission concluded that Stark Solar and Battle Creek Solar were not a single plant and subsequently issued a CPG for Stark Solar. In re Otter Creek Solar LLC, Pursuant to 30 V.S.A. S 248, for a Certificate of Pub. Good Authorizing Installation & Operation of Stark Solar Project, A 2.2 Mw Solar Elec. Generation Facility in Bennington, Vt., No. 19-3236-PET, 2023 WL 314807 at *13 (Vt. Pub. Util. Comm'n. Jan. 12, 2023). However, in that decision, the Commission forewarned that the Warner Solar facility may be a single plant with one of the two other facilities due to its location between Battle Creek Solar and Stark Solar. Id. at *11 n.4. (making no holding on single-plant issue implicating proposed Warner Solar facility, stating

4

"[w]hether the Warner Solar facility constitutes a single plant with Stark Solar, Battle Creek Solar, or both should be assessed separately when, and if, the petitioner in that case seeks to proceed with it").

¶ 9. The Commission held a preliminary evidentiary hearing on Warner Solar's CPG on July 17, 2023. After briefing, the hearing officer issued a proposed decision, recommending that the Commission deny the CPG for Warner Solar because it formed a "single plant" with Battle Creek pursuant to 30 V.S.A. § 8002(18). The Department of Public Service and Otter Creek filed comments in response to the proposed final decision and Otter Creek requested oral argument before the Commission. Oral argument was held on April 4, 2024.

¶ 10. Following oral argument, the Commission issued a final order denying a CPG for Warner Solar, concluding Warner Solar and Battle Creek Solar were a single plant. The Commission denied Otter Creek's motion for reconsideration. This appeal followed.

¶ 11. On appeal, Otter Creek makes multiple alternative arguments regarding the single-plant test, asserting that the Commission improperly applied the test, applied the incorrect test, or should not have applied any test. Otter Creek also argues that its due process rights were violated and that it is entitled to a remand.

III. Standard of Review

¶ 12. We employ a "deferential standard of review to an agency's interpretation of statutes within its area of expertise." In re Portland St. Solar LLC, 2021 VT 67, ¶ 12, 215 Vt. 394, 264 A.3d 872. "When the [Commission] evaluates a CPG petition under 30 V.S.A. § 248, it is engaged in a legislative, policy-making process" and consequently "[o]ur standard of review on appeal is deferential." Id. (quotation omitted). Thus, "[w]e will affirm the [Commission]'s findings unless they are clearly erroneous and its legal conclusions if they are rationally derived from a correct interpretation of the law and supported by the findings." In re Apple Hill Solar

5

LLC, 2019 VT 64, ¶ 27, 211 Vt. 54, 219 A.3d 1295 (quotations omitted). "Our paramount goal in construing a statute is to effectuate the Legislature's intent and where the language of a statute is plain, we must enforce it as written." Chelsea Solar, 2021 VT 27, ¶ 28 (quotation omitted).

## IV.  Analysis

### A.  Applying the Single-Plant Test

¶ 13.  In 30 V.S.A. § 8002(18) the Legislature defined "plant" as:

> an independent technical facility that generates electricity from renewable energy.  A group of facilities, such as wind turbines, shall be considered one plant if the group is part of the same project and uses common equipment and infrastructure such as roads, control facilities, and connections to the electric grid.  Common ownership, contiguity in time of construction, and proximity of facilities to each other shall be relevant to determining whether a group of facilities is part of the same project.

¶ 14.  We have interpreted the definition of "plant" in 30 V.S.A. § 8002(18) in a series of cases.  In Portland Street, we described that § 8002(18) created a "two-prong test for determining whether facilities should be considered a single plant or independent facilities." 2021 VT 67, ¶ 39. "First, [the test asks] whether the facilities are part of the same 'project,' considering '[(1)] common ownership, [(2)] contiguity in time of construction, and [(3)] physical proximity.' Second, it [asks] whether the facilities 'share common equipment and infrastructure.' "[2] Id. ¶ 9 (describing Commission's test adopted by Court).  Both prongs of the single-plant test must be satisfied for the Commission to determine that a proposed facility is part of a single plant under

---

[2] In Portland Street, we concluded that the statutory term " 'equipment and infrastructure' describes a single category of components such as roads, control facilities, and grid connections, rather than two distinct requirements." Id. ¶ 28.  The Court reasoned that to hold otherwise—to consider "and" in the conjunctive sense—would undercut the purpose of the statute because it "would be to allow developers of large projects to easily satisfy the single-plant test by sharing significant infrastructure while avoiding sharing equipment such as transformers, thereby gaining a financial advantage over smaller facilities meant to benefit from the standard-offer and net-metering programs." Id. ¶ 29.

§ 8002(18). Id. ¶ 58. Conversely, if either prong is not met, the facility is not part of a single plant.

¶ 15. Otter Creek argues that Battle Creek and Warner Solar are not a single plant, asserting that neither prong of the single-plant test is satisfied and that the Commission abused its discretion concluding otherwise. The record here supports the Commission's decision.

¶ 16. The first prong of the single-plant test concerns whether Battle Creek and Warner Solar are part of the same project. The statute sets out factors to consider in making that determination. 30 V.S.A. § 8002(18). One such factor is whether the two facilities have "common ownership." Id. In Portland Street, we explained that the Commission "reasonably construed the term 'common ownership' to include an examination of the elements of control and interest beyond the formal corporate status of the immediate owner of each facility." 2021 VT 67, ¶ 44. We reasoned that, "given the broad language and purpose of the [statute]" the Commission could appropriately "consider whether the individuals or entities that ultimately own two facilities are the same rather than whether the facilities are nominally held by distinct LLCs" including "among other things, who developed the projects, owned the completed projects, owned the project site, and leased the land to whom." Id. ¶¶ 42, 44.

¶ 17. In this case, the Commission's decision that there was common ownership of the two facilities was supported by explicit findings concerning the overlapping entities engaged in owning and operating Warner Solar and Battle Creek Solar. According to the hearing officer:

> Thomas Malone [sic] owns Vineyard Sky Allco Limited LLC, which in turn owns Allco. Allco controls the principal corporate entities that nominally manage the development of the two facilities through its subsidiaries, Otter Creek Solar LLC, Battle Creek Solar LLC, and Warner Solar LLC. Allco also has common ownership and control over the two underlying parcels through another subsidiary, PLH Vineyard Sky LLC. The lessees of each site would be the Allco subsidiaries: Battle Creek LLC for Battle Creek Solar and Warner Solar LLC for Warner Solar. Further, as part of sale-lease back financings, the membership interests of Battle Creek

7

Solar LLC were transferred to Vineyard Solar Fund Three, LLC—another Allco subsidiary. The membership interests of Warner Solar would also be transferred to Vineyard Sky Fund Three, LLC if the same sale-leaseback facility is used for Warner Solar's permanent financing.[3]

¶ 18. The Commission did not abuse its discretion in concluding that the overlap of entities involved in owning and managing both the Battle Creek Solar and Warner Solar projects was sufficient to meet the common-ownership factor when determining whether these two facilities were part of the same project. The interconnection between the two facilities regarding various "elements of control and interest beyond the formal corporate status" is sufficient to determine common ownership over the two facilities under the single-plant test. Portland Street, 2021 VT 67, ¶ 44.

¶ 19. Otter Creek takes issue with the test's broad interpretation of the term "ownership." Otter Creek argues that a narrower definition of "ownership" is more appropriate. Using that narrow definition, Otter Creek argues that the common-ownership factor is not met because the Commission "does not dispute that neither [Otter Creek], nor Allco nor anyone else related to any of those entities is the owner of the facility of the Battle Creek Facility." (emphasis omitted). We rejected a similar argument in Portland Street. Id. ¶ 44 (adopting definition of "common ownership" "to include an examination of the elements of control and interest beyond the formal corporate status of the immediate owner of each facility").

_____

[3] Otter Creek states that Allco does not own PLH Vineyard Sky LLC "directly or indirectly." Otter Creek points to the Organizational Chart that it submitted to the Commission which lists Vineyard Sky Allco Limited LLC above Allco Finance Limited, and Allco Vineyard Group LLC, Vineyard Sky Solar LLC, and Vineyard Sky Solar Fund Three, LLC under Allco Finance Limited. It is true that Otter Creek's submitted organizational chart, while listing multiple entities using "vineyard" and "vineyard sky" in their names, does not specifically list PLH Vineyard Sky LLC. However, Otter Creek does not respond to the Commission's statement that its findings are based on the fact that while "[Otter Creek] is correct that it did not include PLH Vineyard Sky LLC in its corporate organization chart. . . . (Allco's website) includes PLH Vineyard Sky LLC as part of the 'Allco Group of Companies' and the arm that 'invests in real estate for solar projects throughout the U.S.' "

8

¶ 20.	As we noted in Chelsea Solar, a broad interpretation of the term "ownership" is especially important given the Legislature's stated goal to "[p]rovid[e] support and incentives to . . . renewable energy plants of small and moderate size." 2021 VT 27, ¶ 40 (quoting 30 V.S.A. § 8001(a)(7)). If we were to hold otherwise and adopt a narrower definition of "ownership," "very few if any plants would have common ownership, and the Legislature's . . . statutory amendment to include 'common ownership' as a factor in the 'same project' analysis would be meaningless." Portland Street, 2021 VT 67, ¶ 44 (quotations omitted), see In re Mountain Top Inn & Resort, 2020 VT 57, ¶ 37, 212 Vt. 554, 238 A.3d 637 ("We consider the whole and every part of the statute and avoid a construction that would render part of the statutory language superfluous.").

¶ 21.	The second factor in the "same-project" prong is whether there was contiguity in time of construction for the two facilities. In Portland Street, we explained that the inquiry should not be reduced to "whether both projects had 'shovels in the ground' simultaneously" and instead, held that the Commission appropriately construed " 'construction' to incorporate all steps in the process, from project planning and site reconnaissance and preparation to physical plant construction and interconnection." 2021 VT 67, ¶¶ 46, 10. We held that the two facilities at issue in Portland Street had contiguity in time of construction because the facilities were "the product of coordinated, simultaneous planning by a common owner" based on jointly used studies and coordinated distribution lines relied on by both facilities. Id. ¶ 45.

¶ 22.	According to Otter Creek, the Commission's interpretation of the term "construction" is too broad.

¶ 23.	We considered and rejected an identical argument in Portland Street and decline to deviate from that decision here. Portland Street explained that 30 V.S.A. § 8002(18) requires a "contiguity" in time of construction—not "simultaneous" construction—and "the word 'contiguous' is defined, in part, as '[n]ear in time or sequence; successive.' " Id. (quoting

9

Contiguous, Black's Law Dictionary (11th ed. 2019)). Furthermore, a broad interpretation of the contiguous-construction requirement aligns with "the statute's underlying purpose of limiting the benefits of the standard-offer and net-metering programs to genuinely independent projects." Id. ¶ 48.

¶ 24. The record here supports that the facilities were conceived of at or around the same time, evinced by their original names: "Battle Creek 1[and] Battle Creek 2." The findings reference four separate coordinated studies done in support of both the Warner Solar and Battle Creek Solar applications, each of which indicates that it was commissioned for the benefit of both projects. Moreover, Otter Creek "sought interconnection review from GMP for each of the facilities" within months of each other. Importantly, the physical development of the Battle Creek facility, which began in early March 2019 and entered operation in September 2019, overlapped with Otter Creek's petition for a CPG for Warner Solar, which was filed in February 2019. Considering these facts and the applicable law, the Commission did not abuse its discretion in concluding that Battle Creek and Warner Solar had contiguity in time of construction.

¶ 25. There is no merit to Otter Creek's contention that the five-to-six-year gap between the two projects shows no contiguity in time of construction. Indeed, the Commission identified that "[i]f it was not for the [Commission's] substantial review of the Stark Solar and Warner Solar facilities, site-preparation, construction, and operation of Battle Creek Solar and Warner Solar would have been closer together." The Commission reasonably applied the contiguity-of-construction factor based on Otter Creek's petition itself rather than external factors created by the Commission's review process.

¶ 26. The final factor in the same-project prong of the single-plant analysis is proximity. 30 V.S.A. § 8002(18) (providing that "proximity of facilities to each other shall be relevant to determining whether a group of facilities is part of the same project"). In Portland Street, we

10

endorsed the Commission's reasoning that the distance between the two facilities should be considered—without arriving at any specific "magic number"—for them to be "proximate." 2021 VT 67, ¶ 51. We also articulated that "intervening buffers such as fences, waterways, forest or vegetation, roads, and building or structures; and topography," should be considered. Id. In that case, we concluded that two facilities were proximate, pointing to a number of considerations: first, that one facility "would be located approximately 100 feet south of" the other's fence line; second, that "the array rows of the two facilities would run parallel to each other east to west;" third, that the northernmost array of one facility "would be approximately 180 feet south" of the other facility; and fourth, that "no natural boundaries separated the two facilities." Id.

¶ 27. Here, the Commission did not abuse its discretion when it determined that the facilities were proximate. The Commission based this decision on the relative short distance between the Battle Creek and Warner Solar facilities—approximately 150 feet—and because both facilities' solar-array rows would run parallel with one another. The Commission considered the railway track and trees between the two facilities but reasonably concluded that they were "not substantial intervening structures or buffers sufficient to overcome the facilities' close proximity and parallel layout, especially given the facilities' size."

¶ 28. The second prong of the single-plant analysis considers whether the facilities share common equipment and infrastructure. See 30 V.S.A. § 8002(18) (requiring facilities to "use[] common equipment and infrastructure such as roads, control facilities, and connections to the electric grid" to be considered a single plant). Otter Creek argues that the facilities' shared distribution line along Rice Lane cannot be considered "common equipment and infrastructure."

¶ 29. In Portland Street, we explained that "[t]he second prong of the single-plant test asks whether the facilities use common equipment or infrastructure 'such as roads, control facilities, and connections to the electric grid.' " 2021 VT 67, ¶ 54. Regarding distribution lines,

11

we have developed a "but-for" test that asks "whether either facility could connect to the electric grid but for the existence of a shared distribution line." Id. ¶ 55. In Chelsea Solar, we held that two facilities were a single plant despite GMP's final ownership of the distribution line, because "but for the line extension, the facilities could not exist. And but for the facilities, the line extension would not exist." 2021 VT 27, ¶ 20. Portland Street focused the test on three considerations: (1) whether the distribution line was preexisting, (2) whether it was necessary for both facilities' interconnection to the grid, and (3) whether it was paid for by the developer. 2021 VT 67, ¶ 57.

¶ 30. Descriptions of Battle Creek Solar and Warner Solar's points of interconnection to the grid are important to understand this issue on appeal. For Battle Creek Solar to safely connect to the grid, Battle Creek paid for a 2400-foot line upgrade, which runs from Battle Creek's point of interconnection on Rice Lane west to an existing GMP line on Silk Road.[4] Warner Solar proposed to build an "extension" line on Rice Lane from Battle Creek Solar's point of interconnection east to its point of interconnection. The Commission found that if Battle Creek had not installed the upgraded line, then Warner Solar would have been responsible for those same upgrades to connect to the Silk-Road distribution line.

---

[4] Otter Creek argues that the Commission should not have concluded that this line upgrade was paid for by Battle Creek because, despite Battle Creek having paid for the upgrade, it was entitled to a refund. To support this assertion, Otter Creek cites V.P.S.B. No. 9 but does not provide any GMP conclusion to that effect. Instead, Otter Creek apparently relies on its own interpretation that GMP should refund Battle Creek. We conclude that the Commission did not abuse its discretion when it declined to consider this argument, stating that "[t]hat issue is not properly before the Commission in this case" because the CPG determination is "certainly not the appropriate forum for attempting to reopen" the negotiations between Otter Creek and GMP regarding funding of an already-built distribution line. Importantly, the Commission based this conclusion on GMP's representation that Otter Creek and GMP had "arrived at the upgrade payment amount [for the Battle Creek line upgrade] through the Commission's Rule 5.500 interconnection procedures", that "the payment had been made [by Battle Creek] without objection," that "the upgrade was necessary for Battle Creek Solar to safely and reliably interconnect," and because "GMP did not contemplate the system upgrade at issue in this case until approximately four years after Battle Creek Solar was interconnected."

¶ 31.    Based on these facts, the Commission concluded that Warner Solar and Battle Creek Solar shared common infrastructure sufficient to meet the second prong of the single-plant test.  The Commission explained as follows: "Battle Creek Solar paid for and installed six upgrades to GMP's distribution system that are necessary for Warner Solar to interconnect safely and reliably to GMP's distribution system."  See Portland Street, 2021 VT 67, ¶ 57 (explaining requirements for common equipment and infrastructure test).  But-for the construction of the distribution line for Battle Creek Solar, neither the Battle Creek nor the Warner Solar facility as-proposed could interconnect to GMP's distribution line.  Considering these findings, the Commission did not abuse its discretion in concluding that, as proposed, the two facilities' interconnection to the grid meets the but-for test: (1) the distribution line did not preexist the facilities, (2) it was necessary for both facilities to interconnect to the grid, and (3) it was paid for by the developer.  See id.

¶ 32.    Otter Creek argues that the Commission abused its discretion because, although it proposed to connect Warner Solar by extending the Battle Creek line, the connection plan was superseded by a planned GMP-funded upgrade.  Otter Creek explains that the GMP upgrade would run a distribution line west from the Battle-Creek funded line along Rice Lane and then south along Harwood Hill Road; this route would overlap with the point where Warner Solar would interconnect.  Otter Creek argues that, due to this upgrade, the short distance of line between Warner Solar and Battle Creek is now functionally unnecessary for Warner Solar because the electricity from Warner Solar could travel east along Rice Lane once the GMP upgrade is complete.  Consequently, Otter Creek asserts that the "but-for" test is not met.

¶ 33.    The Commission did not abuse its discretion in evaluating the project as proposed and not under hypothetical alternatives.  This approach aligns with the statute's purpose to "limit[] the benefits of the standard-offer and net-metering programs to genuinely independent projects"

13

because it forecloses a large facility from reaping the program's benefits simply because it could potentially—but does not propose to—be built in a way where the two facilities do not interconnect. Portland Street, 2021 VT 67, ¶ 48. We note however, that the Commission came to its conclusion even considering the GMP upgrade, stating that "Warner Solar [would be] dependent upon the portion of the line that was upgraded for Battle Creek Solar as well as a portion of the line that will be upgraded by the utility" because "[t]he intervening planned upgrade by GMP does not negate the fact that these upgrades were installed and paid for to safely and reliably interconnect Battle Creek Solar" and because the Battle Creek line remains "necessary for Warner Solar to safely and reliably interconnect as detailed in the System Impact Study."

¶ 34. The Commission did not abuse its discretion when it determined that Warner Solar and Battle Creek Solar share common equipment and infrastructure. Consequently, because Warner Solar and Battle Creek meet both prongs of the single-plant test, the Commission did not abuse its discretion in determining that the two facilities were a single "plant" under § 8002(18).

B. Alternative Single-Plant Test

¶ 35. In the alternative, Otter Creek asserts that the Commission should not have applied the test explained by this Court in Chelsea Solar and Portland Street, and instead, should have applied the "new" single-plant test developed by the Commission in its GlobalFoundries decision. See Declaratory Ruling Regarding the Applicability of the Definition of Tier II Res. Under Vt.'s Renewable Energy Standard to Certain Potential Solar Facilities, Case No. 23-3974-PET (Vt. Pub. Util. Comm'n. Jan. 26, 2024) [https://perma.cc/WD9Z-NRAL] [hereinafter GlobalFoundries].

¶ 36. In GlobalFoundries, the Commission described that GlobalFoundries sought to build a number of solar facilities on its Williston and Essex campuses. Id. at *2-3. The company requested a declaratory ruling from the Commission regarding whether the proposed facilities were a "single plant" for the purpose of Tier II requirements. Id. at *1. Because Tier II adopts the

14

definition of "plant" in 30 V.S.A. § 8002(18), the relevant question in GlobalFoundries was "whether the eight proposed facilities, in any combination of two or more, would constitute a single plant" pursuant to that statute. Id. at *7. The Commission ultimately concluded that GlobalFoundries' multiple proposed facilities were not a single plant. Id. at *10. To reach this conclusion, the Commission reasoned that because of the different statutory purposes supporting the standard-offer program and Tier II requirements, the single-plant test's application of the proximity factor should differ slightly in response to those different purposes.[5]

¶ 37. In the instant case, Otter Creek argues that the Commission's decision to apply the test outlined by this Court in Portland Street and Chelsea Solar rather than the one in GlobalFoundries was an abuse of discretion and "denies [Otter Creek] equal protection of the laws under the Common Benefits Clause." Otter Creek argues that the term "plant," as defined in § 8002(18)—and particularly the proximity factor—should not be defined in two separate ways based on whether the definition is applied in the Tier II context or the standard-offer-contract context.

¶ 38. As an initial matter, it is important to emphasize that the Commission's decision in GlobalFoundries is not controlling precedent for this Court. Instead, this Court's own precedent on the single-plant test is controlling. See Portland Street, 2021 VT 67 (applying single-plant test); Chelsea Solar, 2021 VT 27 (applying single-plant test). This precedent outlines the definition of plant with particular reference to the standard-offer-contract context—which, as explained above, is the context of the instant appeal. Regardless of whether the Commission appropriately adjusted

---

[5] The Commission described that whether two facilities are "proximate" in standard-offer cases, depends on "a number of features, including distance between facilities, intervening buffers (fences, waterways, forest or vegetation, roads, buildings or structures), and topography to ultimately determine how the facilities appear in relation to one another." GlobalFoundries, at *9. However, in the context of Tier II, the Commission reasoned that proximity factor should also "incorporate the aesthetic rationale for the [5 MW] cap that is unique to RES Tier II qualification." Id.

and applied the proximity factor in GlobalFoundries based on the purpose of Tier II regulations, that issue is not on appeal here. The Commission's use of the single-plant test in the instant case based on this Court's precedent was therefore appropriate and reasonable and not an abuse of discretion.

## C. Vested-Rights Doctrine

¶ 39. Next, Otter Creek argues that the Commission applied the incorrect single-plant test because Otter Creek had a "vested right" in the single-plant test at the time it filed its petition for a CPG for Warner Solar.

¶ 40. Some background on the timing of the petition and this Court's caselaw is required to understand this argument. Otter Creek submitted its petition for a CPG for the Warner Solar facility on February 19, 2019. On October 24, 2019, the hearing officer identified the single-plant issue regarding Warner Solar in relation to both Battle Creek Solar and Stark Solar and requested supplemental information. After some additional back-and-forth—receiving, requesting, and receiving more supplemental information from the parties—on February 19, 2021, the hearing officer stayed the case until a final mandate was issued by this Court in Chelsea Solar. This Court's decisions in Chelsea Solar and Portland Street were published on April 16, 2021, and September 3, 2021, respectively. The Warner Solar petition was further stayed pending disposition of the Stark Solar CPG petition, which was granted on January 12, 2023. The next day, the hearing officer issued a procedural order lifting the stay on the Warner Solar CPG petition. The hearing officer subsequently referenced this Court's Chelsea Solar and Portland Street opinions in its decision denying Otter Creek's CPG petition for Warner Solar.

¶ 41. According to Otter Creek, if the Commission had applied the single-plant test as it existed prior to our decisions in Chelsea Solar and Portland Street, Warner Solar and Battle Creek

16

Solar would not be a single plant because the two facilities would not share common equipment and infrastructure.[6]

¶ 42.    We do not reach the question of whether there would be a different outcome under an earlier single-plant test because Otter Creek's argument misinterprets the vested-rights doctrine. The doctrine applies to substantive changes to statutes and regulations and not the interpretation of those statutes by the courts.

¶ 43.    Vermont follows the minority rule regarding vested rights. Development rights vest "under existing regulations and laws as of the time when the proper application is filed." In re Times & Seasons, LLC, 2011 VT 76, ¶ 13, 190 Vt. 163, 27 A.3d 323. This approach "protects applicants from newly adopted ordinances, regulations, or laws unfavorable to an already-submitted permit application" and "prevents an applicant from selectively taking advantage of favorable changes in the law." Id. ¶ 14 (emphasis added).

¶ 44.    The Commission did not abuse its discretion by applying the single-plant test to Otter Creek's application as articulated by this Court in Chelsea Solar. The vested-rights doctrine does not apply in this case because the relevant statute did not change during the pendency of the Warner Solar petition. See 30 V.S.A. § 8002(18).

D.  Claim and Issue Preclusion

¶ 45.    The law does not support Otter Creek's next argument that issue and claim preclusion bar the Commission from revisiting the single-plant issue during the CPG process. According to Otter Creek, the single-plant issue had been considered as part of the Commission's

---

[6] Contrary to Otter Creek's assertion that the single-plant test "changed" due to this Court's decision in Chelsea Solar, the Commission interpreted our precedent to indicate that the determinations in Chelsea Solar and Portland Street "did not depart from early analyses of the single-plant issue under the current wording of the statute." We do not address this issue as it is not pertinent to our decision on whether the vested-rights doctrine applies.

17

decision to offer Otter Creek a standard-offer contract, and therefore, could not be considered again.

¶ 46.    Because the applicability of claim and issue preclusion are questions of law outside the Commission's area of special expertise, "we review the question of whether [they] appl[y] without deference to the [Commission]." Apple Hill Solar LLC, 2019 VT 64, ¶ 22.

¶ 47.    The doctrine of res judicata, also called claim preclusion, "bars the litigation of a claim or defense if there exists a final judgment in former litigation in which the parties, subject matter and causes of action are identical or substantially identical." Lamb v. Geovjian, 165 Vt. 375, 379, 683 A.2d 731, 734 (1996) (quotations omitted). "The doctrine does not require that the claims were actually litigated in the prior proceeding; rather, it applies to claims that were or should have been litigated in the prior proceeding." In re Tariff Filing of Cent. Vt. Pub. Serv. Corp., 172 Vt. 14, 20, 769 A.2d 668, 674 (2001). Similarly, collateral estoppel, also called issue preclusion, "bars the relitigation of an issue, rather than a claim, that was actually litigated by the parties and decided in a prior case." Id.

¶ 48.    According to Otter Creek, the Commission determined that Warner Solar and Battle Creek Solar were not a single plant under § 8002(18) as part of the RFP process—as it had done explicitly with another renewable energy dam facility, which it rejected because the dam was a "single plant" with another nearby facility. Consequently, Otter Creek argues that the Commission cannot revisit that same issue when determining if that plant should receive a CPG.

¶ 49.    We have previously held that both claim preclusion and issue preclusion apply to administrative adjudicatory decisions. See Sheehan v. Dep't of Emp. & Training, 169 Vt. 304, 308, 733 A.2d 88, 91 (1999) ("It is generally recognized that [t]he doctrines of res judicata and collateral estoppel are applicable to administrative proceedings when an agency is acting in a judicial capacity." (quotation omitted)). However, we have also explained that whether an

administrative agency is acting in a judicial capacity is critical to this analysis because "administrative decisions that do not entail the essential elements of adjudication will not have" preclusive effect. Delozier v. State, 160 Vt. 426, 429, 631 A.2d 228, 230 (1993) (collecting cases); see also Azby Brokerage, Inc. v. Allstate Ins. Co., 681 F. Supp. 1084, 1087 (S.D.N.Y. 1988) ("An action taken by an administrative agency . . . is not an adjudicated action unless the agency has made its decision using procedures substantially similar to those employed by the courts." (quotation omitted)). "These elements include adequate notice to interested parties, the right of parties to present evidence and legal argument, final judgment, and procedural elements necessary to afford fair determination of the matter in light of the magnitude and complexity of the matter." Tariff Filing, 172 Vt. at 39, 769 A.2d at 687 (quotation omitted); see also Restatement (Second) of Judgments § 83 (1982) (listing essential elements of adjudication).

¶ 50.    Therefore, the pertinent issue here is whether the RFP process that the Commission engaged in was an "adjudicatory proceeding." See Restatement (Second) of Judgments § 83 cmt. b ("The essential question is whether, within the context of the larger purpose of an administrative proceeding, an issue is formulated as it would be in a court and decided according to procedures similar to those of a court."). It was not. The Commission's process of reviewing projects in response to its proposal request bears little resemblance to a formal adjudicatory proceeding. The Commission did not hold a hearing, did not make formal findings of fact, and did not hear any testimony or make formal credibility determinations. The Commission did request and offer the opportunity for participants to make "comments" on whether the Commission should offer contracts to specific proposed facilities. However, the ability to "comment" on questions or others' proposals does not establish a sufficiently contested or adversarial process for preclusion to apply. Consequently, neither claim preclusion nor issue preclusion apply here, and as a result, the

19

Commission was not barred from adjudicating the single-plant issue during the CPG determination.

E. Single-Plant Analysis and Scope of 30 V.S.A. § 248

¶ 51. Next Otter Creek argues that the Commission impermissibly engaged in the single-plant analysis during its CPG determination under 30 V.S.A. § 248 because that statute provides no authority to the Commission to consider the single-plant issue. According to Otter Creek, the definition of "plant" in § 8002(18) is irrelevant to the Commission's CPG determination except regarding the specific sections where it is explicitly mentioned. See, e.g., 30 V.S.A. § 248(a)(1)(A) (referencing definition of "plant" in § 8002(18)). Accordingly, Otter Creek argues that because its CPG application did not implicate any of those sections, the definition of "plant" was irrelevant to its application and could not be grounds to deny that application.

¶ 52. This Court has previously addressed and rejected this argument. In Chelsea Solar, the Court was faced with a situation similar to the one at issue here. The Commission had refused to issue a facility a CPG because it failed the single-plant test and therefore was over the 2.2 MW statutory cap for the Standard Offer Program. Chelsea Solar, 2021 VT 27, ¶ 1. The developer argued that the Commission "could not consider the single-plant issue" as part of the CPG process and "was instead obligated to issue a CPG once it determined that the CPG factors were satisfied." Id. ¶ 27 n.4. We were not persuaded. We reasoned that because the two facilities at issue were a single plant with a larger output, the "developer's evidence was defective and [the] developer could not meet its burden of demonstrating compliance with § 248" because "the evidence [the] developer submitted in support of its application for a CPG was based on a description of a 2.0-MW solar plant, rather than a 4.0-MW plant." Id. ¶ 24. Due to its 4.0 MW size, we explained that the developer could not take advantage of certain portions of the statute that benefitted standard-

20

offer-contract holders. Id. We concluded that, as a result, a single-plant determination was relevant to a CPG determination.

¶ 53. We see no compelling reason to deviate from our prior conclusion on this issue. Pursuant to its rulemaking authority, the Commission has created conditional waivers of certain § 248 criteria for plants with 1.5 to 2.2 MW capacities, linking plant capacity to CPG determinations as a threshold question to determine the appropriate procedural pathway for a project. See In re Simplified Procs. for Renewable Energy Plants with a Capacity Between 150 kW and 2.2 MW, (Pub. Serv. Bd., Aug. 31, 2021) (adopted under § 8007(b)) https://puc.vermont.gov/sites/psbnew/files/doc_library/simplified-procedures-for-renewable-energy-plants.pdf [https://perma.cc/8AKG-9748] (recommending and adopting that "the following criteria be conditionally waived solely for standard-offer projects with plant capacities that are greater than 150 kW and are 2.2 MW or less: 30 V.S.A. § 248(b)(4)—Economic Benefit to the State, 30 V.S.A. § 248(b)(6)—Least-Cost Integrated Resource Plan"). Furthermore, the record indicates that Otter Creek relied on its description of Warner Solar as a 2.2 MW solar plant in its initial CPG petition. Specifically, in response to multiple questions pertaining to CPG criteria, Otter Creek presented testimony representing that the Warner Solar facility was "waived from evaluation" from certain statutory requirements in 30 V.S.A. § 248(b)(2) due to its plant capacity.[7] Thus, as demonstrated by the Commission's procedures, the facts in Chelsea Solar, and the facts in this case, a plant's capacity is relevant to the Commission's CPG-determination process. Therefore, contrary to Otter Creek's assertion, the Commission is within its authority to

---

[7] In its reply brief, Otter Creek asserts that it supplemented its testimony such that Warner Solar no longer relied on any waiver of 30 V.S.A. § 248 criteria due to its plant size. Regardless of whether Warner Solar would ultimately rely on a waiver due to plant size, the single-plant analysis remains a relevant piece of the Commission's determination of the appropriate scope of review under the § 248 criteria. See In re Simplified Procs. for Renewable Energy Plants with a Capacity Between 150 kW and 2.2 MW.

consider the single-plant analysis in response to a CPG petition. See In re Derby GLC Solar, LLC, 2019 VT 77, ¶ 18, 211 Vt. 144, 221 A.3d 777 (describing Commission's broad authority to interpret and implement 30 V.S.A. § 248).

## F. Due Process Rights

¶ 54. Otter Creek's final argument is that the Commission's final order violated its due process rights because it was an "unfair surprise." According to Otter Creek, the Commission violated Commission Rule 2.2145 and 3 V.S.A. § 811 by deviating from the hearing officer's proposed final decision.

¶ 55. In the proposed final decision, the hearing officer concluded that Warner Solar and Battle Creek Solar met the second prong of the single-plant test in a number of ways. The hearing officer articulated that the Direct Transfer Trip (DTT) scheme,[8] the distribution line upgrade, and "[a]ll six distribution system upgrades listed in Warner Solar's System Impact Study . . . satisfy this [prong]" because they were "upgrades installed for Battle Creek Solar but necessary for Warner Solar to interconnect." Ultimately, however, the hearing officer concluded that because, at minimum, the DTT scheme satisfied the but-for test, the Commission need not address some of the arguments made by Otter Creek related to the other upgrades. Specifically, the hearing officer advised that "the Commission need not decide" whether GMP's plan to upgrade the "distribution line along Rice Lane independent of whether Warner Solar is installed somehow 'breaks' the connection of the Battle Creek Solar infrastructure to Warner Solar."

¶ 56. However, following Otter Creek and GMP's comments on the hearing officer's proposal for decision, the Commission concluded that "the DTT scheme listed in Warner Solar's System Impact Study will no longer be needed under updated engineering standards." As a result,

---

[8] A DTT scheme is put in place to handle a fault on the system. It sends an automatic trip to the generator to de-energize the feed and prevent islanding and allows the breaker at the substation to open and clear the fault without having an impact on other feeds.

the Commission determined that it "must decide whether other potential shared infrastructure and equipment satisfy the single-plant test." As described above, the Commission subsequently concluded that the shared distribution line built and paid for by Battle Creek Solar amounted to shared infrastructure and therefore met the but-for test.

¶ 57. We hold that the Commission acted within its authority to reach its conclusion based on different grounds than those relied on by the hearing officer. Section 811 of Title 3 requires that in a contested case, such as this, "the decision . . . shall not be made until a proposal for decision is served upon the parties, and an opportunity is afforded to each party adversely affected to file exceptions and present briefs and oral argument to the officials who are to render the decision." The record demonstrates that the hearing officer's proposal for final decision was circulated to the parties and that Otter Creek had the opportunity to respond and filed comments on the proposed decision. Thus, the process engaged in by the hearing officer and Commission met each of the requirements laid out in in § 811.

¶ 58. Otter Creek attempts to argue that the same statutory requirements for proposed orders exist for final decisions. It opines that it should have been afforded the opportunity to file exceptions to the Commission's final decision. The statutory language does not support this interpretation. Although the statute requires that the proposal for decision be served to the parties, there is no such requirement for the Commission's final decision, and we decline to read it into the statute. See 3 V.S.A. § 811 (providing parties must be served proposed decision and provided with opportunity to respond); id. § 812 (listing requirements for final decision and not including similar notice and opportunity for comment). As we have frequently articulated, "[i]t is inappropriate to read into a statute something which is not there unless it is necessary in order to make the statute effective." State v. O'Neill, 165 Vt. 270, 275, 682 A.2d 943, 946 (1996) (emphasis omitted).

¶ 59. We also note that the proposal for decision discussed the equipment and infrastructure relied on by the Commission in its final order. Otter Creek's comments on the proposed decision also made arguments about the upgrades discussed by the hearing officer, including the distribution line. We conclude that Otter Creek's due process rights were not violated. It was on clear notice of the issue and was offered a meaningful opportunity to be heard. See In re M.R., 2025 VT 6, ¶ 15, __ Vt. __, 331 A.3d 1120 ("The essential hallmarks of procedural due process are notice and an opportunity to be heard.").

## G. New Hearing Arguments

¶ 60. According to Otter Creek, it is entitled to a new hearing for three reasons: (1) because of the Commission's "factual holding that there is a financial incentive," (2) because the gang-operated airbreak switch cannot satisfy the "but-for" test, and (3) because the Commission provided no opportunity for Otter Creek to amend its proposal. We address each argument in turn.

¶ 61. Otter Creek assigns error to the Commission's statement that "[u]ntil our [GlobalFoundries] declaratory ruling, we had applied the single-plant definition only in the context of financial incentive programs 'to ensure that large projects do not cause a detrimental impact on Vermont ratepayers.' " GlobalFoundries, at *8 (citing cases). Otter Creek appears to take issue with the notion that Otter Creek may be causing a "detrimental impact" on ratepayers and puts forward arguments that it is, instead, "sav[ing] ratepayers substantial amounts of money." According to Otter Creek, it is entitled to present evidence on this "newly raised issue" to "debunk the baseless 'incentive' notion." Finally, Otter Creek once again opines that GlobalFoundries was wrongly decided—arguing that GlobalFoundries is "escaping costs imposed by the Legislature."

¶ 62. The statement quoted by Otter Creek above was made by the Commission in direct reference to its rationale for differentiating between the standard-offer and Tier-II contexts and to

support its conclusion that the single-plant test articulated in Portland Street and Chelsea Solar should be applied to Otter Creek's petition. As we described above, we agree with the Commission that this Court's precedent outlining the correct single-plant test is controlling here. See Portland Street, 2021 VT 67 (applying single-plant test) and Chelsea Solar, 2021 VT 27 (applying single-plant test). Consequently, the Commission's rationale for differentiating the two analyses is irrelevant and immaterial to this case. See O'Brien v. Synnott, 2013 VT 33, ¶ 9, 193 Vt. 546, 72 A.3d 331 ("The issue is material only if it might affect the outcome." (quotation omitted)). Whether Otter Creek would be receiving a "financial incentive" or would be saving ratepayers money is similarly immaterial and a new hearing is not warranted.

¶ 63. Next, Otter Creek argues that it is entitled to a new hearing because the gang-operated airbreak switch could not satisfy the "but-for" test. Because we conclude that Battle Creek and Warner Solar share common infrastructure due to Warner Solar's reliance on the line upgrade paid and built for the Battle Creek facility, we need neither address nor remand the case for a new hearing to determine if the Commission properly concluded that the gang-operated airbreak switch was also common equipment and infrastructure.

¶ 64. Finally, Otter Creek argues that it is entitled to a new hearing based on the hearing officer's statement that "[s]hould the Commission determine that Warner Solar is a single plant with either Battle Creek Solar or Stark Solar, then [Otter Creek] may decide to propose an alternative interconnection route for Warner Solar" but instructing that, if it so chose, Otter Creek "must follow the procedure for making a substantial change, pursuant to Commission Rule 5.407, to do so." According to Otter Creek, because it was not provided an opportunity to amend its interconnection route in the proposal for decision, it is entitled to a remand.

¶ 65. Otter Creek's argument was not preserved on appeal. "[T]o properly preserve an issue, a party must present the issue to the administrative agency with specificity and clarity in a

manner which gives the [agency] a fair opportunity to rule on it." Pratt v. Pallito, 2017 VT 22, ¶ 16, 204 Vt. 313, 167 A.3d 320 (quotation omitted). In this case, Otter Creek asserts that "the hearing officer sandbagged [Otter Creek] and provided no such opportunity to amend in the proposal for decision" but includes no cite to the record indicating whether and when Otter Creek attempted to propose an alternative interconnection route either before the Commission's final decision or afterwards. See V.R.A.P. 28(a)(4)(A) (requiring appellant's brief to include "citations to the authorities, statutes, and parts of the record on which the appellant relies"). Absent such a request from Otter Creek, the Commission was not presented with a fair opportunity to rule on the issue and we will not address it here. See In re White, 172 Vt. 335, 343, 779 A.2d 1264, 1270 (2001) ("We have repeatedly stressed that we will not address arguments not properly preserved for appeal.").

Affirmed.

FOR THE COURT:

_____

Associate Justice